UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Tanya J. Fjelsta,

      Plaintiff,

v.                                                                                                   Civ. No. 04-1717 (JNE/FLN)
                                                                                                   ORDER

Zogg Dermatology PLC, Percs USA, Inc.,
Brian Zogg, and Deanne Zogg,

      Defendants.

---

Adam A. Gillette, Esq., Nichols Kaster & Anderson, PLLP, appeared for Plaintiff Tanya J. Fjelsta.

Mary L. Senkbeil, Esq., and David J. Duddleston, Esq., Jackson Lewis LLP, appeared for Defendants Zogg Dermatology PLC, Percs USA, Inc., Brian Zogg, and Deanne Zogg.

---

      Tanya Fjelsta alleges that her former employers and supervisors—Zogg Dermatology PLC, Percs USA, Inc., Brian Zogg, and Deanne Zogg (collectively, Defendants)—discriminated against her on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2000e-17 (2000); discriminated against her on the basis of her pregnancy in violation of the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.01-.41 (2004); retaliated against her in violation of Minnesota's whistleblower statute, Minn. Stat. § 181.932 (2004); and defamed her. Fjelsta also asserts a claim for battery against Brian Zogg and Zogg Dermatology. The case is before the Court on Defendants' Motion for Summary Judgment. For the reasons set forth below, the Court grants the motion.

                                               **I.    BACKGROUND**

     Zogg Dermatology is a dermatology clinic in Albert Lea, Minnesota. In early 2003, it entered into a contract with Percs USA, a provider of medical management services, to provide

1

employees, payroll services, and other services to the clinic. Under the contract, Percs employed those who worked at Zogg Dermatology.

Fjelsta started to work at Zogg Dermatology on January 27, 2003, as a registered nurse. At that time, the clinic's staff also included Brian Zogg, the onsite medical director; Deanne Zogg, the office manager and a registered nurse; Roxanne Medd, a licensed professional nurse; an accounts receivable clerk; and a receptionist.

As a registered nurse, Fjelsta assisted Brian Zogg's performance of various medical procedures. During her first three months of employment, Fjelsta questioned how Zogg Dermatology used multi-dose vials. According to Fjelsta's deposition testimony, Deanne Zogg assured her that proper technique would prevent contamination. Upon completion of her first three months at Zogg Dermatology, Fjelsta received a performance review. The review noted that Fjelsta had "worked hard to achieve an independent work status" and that "for many of the duties [she] is getting there." After assessing her experiences with patients and surgical procedures, the review stated: "Overall, [Fjelsta] is doing a good job. She has much to learn, as does anyone [entering] this practice. She appears to enjoy her job, seems ready to learn, is punctual and ready to work, offering assistance in any task. All of these qualities are very appreciated." The review concluded by offering Fjelsta "permanent work" and benefits of full-time staff.

In early June 2003, Medd informed her colleagues at Zogg Dermatology of her pregnancy. According to Fjelsta, Deanne Zogg responded on June 9, 2003, to Medd's announcement by stating: "Tanya, you better take precautions so both you girls don't end up pregnant. We can't have both nurses gone at the same time." Deanne Zogg denies making this statement.

2

Approximately one month later, Fjelsta had a telephone conversation with Deanne Zogg. During that conversation, Fjelsta stated that she was pregnant and that she had concerns about the pregnancy. Fjelsta also asked to take the following day off so that she could seek medical attention to address her concerns. She took that day off without being disciplined.

About ten days later, on July 21, 2003, Fjelsta testified that the atmosphere at Zogg Dermatology changed. That day, according to Deanne Zogg, Fjelsta breached surgical procedures designed to maintain a sterile environment by touching a file cabinet and a chart while wearing contaminated gloves. At her deposition, Fjelsta did not recall this incident and stated that it did not happen. She did, however, acknowledge a breach of sterile procedure on another occasion. According to Medd's affidavit, Fjelsta breached sterile procedure on numerous occasions.

On July 23, 2003, Fjelsta received a six-month performance review.[1] The review describes Fjelsta's second three months of employment as an "erratic period." It notes that she started to work independently, that "she has shown growth in many areas," and that she "has continued to have difficulty in surgery." The review specifically notes her difficulties with "concepts of sterile technique and clean vs. contaminated concepts." Under the heading "Medical," the review states that Fjelsta "has been growing in her knowledge of the medical difficulties that are treated in this office," that Brian Zogg had concerns about her "indiscriminate use of terminology," and that "[d]ocumentation in the chart when working up a new person has been overall good." The review continues by highlighting the need for Fjelsta to document her observations instead of attempting to diagnose the patient. Under the heading

---

[1] In her memorandum in opposition to Defendants' motion, Fjelsta characterizes the six-month review as "out of the ordinary." The record does not support this characterization. Fjelsta received a job description when she started at Zogg Dermatology. The job description anticipates a review upon an employee's completion of 180 days of employment.

3

"Surgically," the review asserts Fjelsta breached procedures designed to maintain a sterile environment and characterizes Fjelsta's knowledge of surgical procedures as limited. The review concludes by placing Fjelsta on probation for ninety days, scheduling performance reviews at thirty-day intervals within the probationary period, and deferring "the final decision of [her] continued employment pending correction of difficulties" to the end of the probationary period. After reading the review, Fjelsta reiterated her questions about Zogg Dermatology's use of multi-dose vials.

After leaving work on July 23, Fjelsta started a written response to her six-month review. On August 11, 2003, she presented the response to Deanne Zogg who then passed it to Brian Zogg. Fjelsta's response asserted the six-month review included examples of conduct since July 21 and referred to Deanne Zogg's alleged June 9 response to Medd's pregnancy. Fjelsta also expressed surprise that her performance was characterized as "erratic." After explaining the incident when she had allegedly used incorrect terminology, she asserted that Brian Zogg's expectations of his nurses were "too great." She then disputed the review's characterization of her knowledge of surgical procedures. She concluded by asserting that Zogg Dermatology violated Minn. R. 6950.1060, subp. 2(A), by withdrawing fluids from a multi-dose vial with a sterile needle attached to a contaminated syringe.

After reviewing Fjelsta's response and discussing it with Deanne Zogg, Brian Zogg asked to speak to Fjelsta in his office. He asked Fjelsta to leave for the day. According to Fjelsta,[2] she responded to Brian Zogg by repeatedly asking why he asked her to leave. Eventually, Deanne Zogg gave insubordination as the reason. Brian Zogg then opened the office door, took hold of

---

[2]   Brian Zogg's account of what occurred in the wake of his request differs from that of Fjelsta, especially with regard to the amount of force he used to escort her out of the building and the statements he made. For present purposes, the Court assumes Fjelsta's account is accurate.

4

Fjelsta's arm, and walked her to a cupboard outside of the office. There, he told Fjelsta to retrieve her purse. She responded that she did not have a purse. She pulled her arm away and asked Brian Zogg whether he thought it necessary to grab her. Fjelsta walked to her desk to retrieve a folder and a pad of paper. As she was writing the word "insubordination," Brian Zogg started to push her out of the building. As he was pushing Fjelsta out of the building, he made statements to Fjelsta including "get out of here now" and "you're not welcome." After pushing Fjelsta out of the building, Brian Zogg locked the door. Fjelsta yelled that she wanted her folder. Brian Zogg responded that she would have to send for it. She replied that she wanted her folder now. Brian Zogg retrieved it, unlocked and opened the door, handed her folder to her, told her to have a nice life, and locked the door. After a few moments, Fjelsta left.

According to Lisa Stadheim, who was the accounts receivable clerk, Deanne Zogg held a meeting with the remaining staff after Fjelsta had left. According to Stadheim's deposition testimony, Deanne Zogg stated at the meeting that Fjelsta had been terminated.

On the night of August 11, Fjelsta wrote a letter to Deanne Zogg and Brian Zogg. She sent it to them via e-mail early the next morning. The letter expresses uncertainty about Fjelsta's employment status and assumes her employment was terminated:

> I am writing to inform you that I will be taking a sick day tomorrow as my father in-law was hospitalized tonight in Minneapolis after suffering a heart attack. I also waited to hear from you as I am not sure of my employment status with your office. I assume that my employment was terminated this morning after I was told by Dr. Zogg that "I was not welcome in the building" and sarcastically told to "Have a nice life", once outside the premises. Please confirm that this was your intention and that I will no longer be employed with Zogg Dermatology.

On August 13, not having received a response to her e-mail, Fjelsta called the Percs Employee Answer Group. She spoke to Susan Stockfish and Augustus Curcio, Stockfish's supervisor, about the events of August 11. Stockfish and Curcio contacted Zogg Dermatology, were

5

informed that Fjelsta had not been terminated, and relayed this information to Fjelsta. On the evening of August 13, Deanne Zogg responded to Fjelsta's e-mail:

> Based upon your e-mail, you remain an employee of Zogg Dermatology . . . with no break in service.
>
> Please report to work on Tuesday @ 7AM, our next scheduled work date.
>
> We feel confident that we can resolve any differences that may have occurred.

Fjelsta did not return to work at Zogg Dermatology.

Fjelsta filed a Charge of Discrimination, dated September 12, 2003, with the Equal Employment Opportunity Commission (EEOC). At her request, the EEOC sent Fjelsta a Notice of Right to Sue on January 23, 2004. She brought this action in April 2004 and Defendants now move for summary judgment.

## II.   DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.     Title VII**

Fjelsta claims that Defendants violated Title VII by placing her on probation and terminating her employment because of her pregnancy.[3] Under Title VII, it is an unlawful employment practice for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The term "because of sex" includes "because of or on the basis of pregnancy." *Id.* § 2000e(k).

A plaintiff who asserts a claim under Title VII may survive a defendant's motion for summary judgment in one of two ways. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th

---

[3] After the motion hearing, the Court directed Fjelsta to supplement the record with evidence that she exhausted her administrative remedies. *See Mohr v. Dustrol, Inc.*, 306 F.3d 636, 643-45 (8th Cir. 2002) (remarking that enforcement of "Title VII's mandatory exhaustion requirement" only when invoked by party would be "anomalous"; affirming grant of summary judgment for failure to exhaust administrative remedies even though defendant had not raised exhaustion argument); *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 630 (8th Cir. 2000) ("In order to initiate a claim under Title VII a party must timely file a charge of discrimination with the EEOC and receive a right-to-sue letter."). Fjelsta filed her Charge of Discrimination and Notice of Right to Sue, which was issued pursuant to 29 C.F.R. § 1601.28(a)(2) (2005). Defendants responded by asserting the invalidity of Fjelsta's Notice of Right to Sue. Courts of appeals have reached conflicting conclusions as to the validity of section 1601.28(a)(2). *Compare Martini v. Fed. Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1347-48 (D.C. Cir. 1999) ("We thus hold that Title VII complainants must wait 180 days after filing charges with the EEOC before they may sue in federal court."), *with Sims v. Trus Joist MacMillan*, 22 F.3d 1059, 1060 (11th Cir. 1994) (holding that "early issuance of a notice of right to sue based on the [EEOC's] certification that it will be unable to process the charge within 180 days does not preclude a claimant from filing an action in federal court"), *and Brown v. Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726, 729 (9th Cir. 1984) (upholding "validity of right to sue notices issued prior to the expiration of 180 days"). The Court declines to address the validity of section 1601.28(a)(2) at this time. *Martini*, the case on which Defendants primarily rely, states that "the 180-day waiting period is not jurisdictional." 178 F.3d at 1348; *see Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1228 (10th Cir. 1997) ("[W]e believe that the allegedly premature issuance of the right to sue letter in this case is, at most, an affirmative defense which the defendant has waived by failing to take a cross-appeal."). In their motion papers, Defendants did not assert that Fjelsta had failed to exhaust her administrative remedies. Having satisfied itself that Fjelsta filed a charge of discrimination, that she received a notice of right to sue, and that her Title VII claim is within the scope of her charge, the Court proceeds to analyze the arguments raised in the parties' motion papers. *See Mohr*, 306 F.3d at 643-45; *Roe*, 124 F.3d at 1228.

Cir. 2004). First, the plaintiff may provide direct evidence that an illegitimate criterion motivated an employer to take an adverse employment action. *Id.* In this context, "'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Id.* Second, the plaintiff may create an inference of unlawful discrimination by satisfying the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Griffith*, 387 F.3d at 736. Under that analysis, the plaintiff must demonstrate a prima facie case of discrimination by demonstrating: (1) she was a member of a protected group; (2) she was qualified for her position; (3) she experienced an adverse employment action under circumstances that give rise to an inference of discrimination. *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 857 (8th Cir. 1998). If the plaintiff establishes the prima facie case, the defendant must offer a nondiscriminatory reason for its action. *Id.* The plaintiff then must show the proffered reason was a pretext for discrimination. *Id.* at 857-58.

Defendants first argue that Fjelsta's Title VII claim against Brian Zogg and Deanne Zogg in their individual capacities should be dismissed because the Zoggs were Fjelsta's supervisors. Under Title VII, supervisors may not be held individually liable. *Roark v. City of Hazen, Ark.*, 189 F.3d 758, 761 (8th Cir. 1999) ("The district court also properly dismissed Roark's claim against Orlicek in his individual capacity because a supervisor may not be held individually liable under Title VII."); *Bonomolo-Hagen v. Clay Central-Everly Cmty. Sch. Dist.*, 121 F.3d 446, 447 (8th Cir. 1997) (per curiam) ("Our Court quite recently has squarely held that supervisors may not be held individually liable under Title VII."). In this case, the Zoggs were Fjelsta's supervisors. Accordingly, the Court dismisses Fjelsta's Title VII claim against them.

Defendants next argue that they are entitled to summary judgment on Fjelsta's Title VII claim because they did not take any adverse employment actions against her. An adverse

employment action is one that produces a material employment disadvantage. *Baucom v. Holiday Cos.*, 428 F.3d 764, 767 (8th Cir. 2005); *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir. 1999). In *Kerns*, the Eighth Circuit listed examples of adverse employment actions: "Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge." 178 F.3d at 1016 (citations omitted).

In this case, Fjelsta contends her placement on probation is an adverse employment action because it "affected her future career prospects at Zogg Dermatology." She does not, however, explain how her probation adversely affected her future career prospects at the clinic. *Cf. Cross v. Cleaver*, 142 F.3d 1059, 1073 (8th Cir. 1998) (summarizing cases involving sufficiently adverse actions). Zogg Dermatology is a small clinic that had only one other registered nurse on staff when it hired Fjelsta. The negative connotations associated with her placement on probation are insufficient to transform it into an adverse employment action. *See Baucom*, 428 F.3d at 768. In addition, the probation itself did not alter the terms and conditions of Fjelsta's employment. *See Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891-92 (8th Cir. 2005) (holding placement of employee on administrative leave pending investigation was not adverse employment action when employee maintained pay, grade, and benefits during leave). At her deposition, Fjelsta testified that neither her hourly wage nor her hours changed after her placement on probation. She also testified that her benefits remained the same. Fjelsta does not argue that her responsibilities changed after the 180-day performance review. In fact, she testified that she continued to "first assist" in surgeries after the review. Although the probationary period anticipated more frequent reviews of Fjelsta's performance, placement of an employee on a performance improvement plan does not itself constitute an adverse employment

9

action. *See Zhuang v. Datacard Corp.*, 414 F.3d 849, 852, 854 (8th Cir. 2005); *Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005) (per curiam). Viewed in the light most favorable to Fjelsta, the record reveals that her placement on probation did not produce a material employment disadvantage. The Court therefore dismisses Fjelsta's Title VII claim insofar as it is based on her placement on probation.

As to Fjelsta's claim that she was terminated in violation of Title VII, Defendants acknowledge that termination is an adverse employment action. *See Kerns*, 178 F.3d at 1016. They contend that they are entitled to summary judgment because they did not terminate her employment. For present purposes, the Court assumes that Fjelsta's account of her removal from Zogg Dermatology on August 11, 2003, is accurate. Accordingly, the Court assumes that Brian Zogg pushed her out of the clinic while yelling at her to leave and that she was not welcome at the clinic. In addition, the Court assumes that Deanne Zogg stated that Fjelsta was terminated at a meeting held with the clinic's staff after Fjelsta's removal from the clinic. Viewing the record in the light most favorable to Fjelsta, a reasonable finder of fact could conclude that she was terminated.

Defendants next argue that they are entitled to summary judgment on Fjelsta's claim that she was terminated in violation of Title VII because there is no evidence that her pregnancy was a motivating factor in her termination. Fjelsta maintains that she presented direct evidence that her pregnancy was a motivating factor in her termination. "[D]irect evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Griffith*, 387 F.3d at 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)). "Not all comments that

may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support such an inference. For example, stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself will not suffice." *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999) (quotations omitted).

In this case, Fjelsta characterizes Deanne Zogg's response in June 2003 to Medd's pregnancy and the 180-day performance review as direct evidence of pregnancy discrimination. She has not, however, linked her termination with the response or her review. Neither the statement nor the review took place contemporaneously or directly in connection with her termination. *See Deneen v. Nw. Airlines, Inc.*, 132 F.3d 431, 436 (8th Cir. 1998). The review itself contemplates Fjelsta's continued employment for at least ninety days. On this record, the Court discerns no direct evidence that Fjelsta's pregnancy motivated Defendants to terminate her employment. Accordingly, the Court analyzes her claim under *McDonnell Douglas*.

Defendants do not dispute that Fjelsta was a member of a protected group and that she was qualified for her position. For present purposes, the Court assumes that she was terminated. To establish her prima facie case, Fjelsta must demonstrate that her termination took place under circumstances that give rise to an inference of discrimination. In this case, Deanne Zogg allegedly told Fjelsta in June 2003 to take precautions against becoming pregnant. The next month, Fjelsta informed Defendants of her pregnancy. In late July 2003, Fjelsta was placed on probation for ninety days. In mid-August 2003, Defendants allegedly terminated Fjelsta's employment. Although "close temporal proximity between an employer's discovery of a protected characteristic and an adverse employment action may, on rare occasions, suffice to create an inference of discrimination," *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1019

11

(8th Cir. 2005), the circumstances surrounding Fjelsta's alleged termination do not give rise to an inference of discrimination. Fjelsta's termination took place only after she had refused to leave for the day as requested by Brian Zogg, tensions had escalated, and Brian Zogg had physically removed her from the clinic. In light of Fjelsta's failure to comply with Brian Zogg's request and the situation's degeneration into pushing and yelling, the record reveals no connection between Fjelsta's pregnancy and her termination. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) ("Kiel's intervening unprotected conduct eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination."). Accordingly, the Court grants Defendants' motion as it relates to Fjelsta's claim that she was terminated in violation of Title VII.

**B.     MHRA**

Fjelsta claims that Defendants violated the MHRA by placing her on probation and terminating her employment because of her pregnancy. Defendants are entitled to summary judgment on this claim for the same reasons that they are entitled to summary judgment on Fjelsta's Title VII claim. *See Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir. 1997) ("In analyzing cases under the MHRA, the state courts apply the principles developed in the adjudication of claims under Title VII because of the substantial similarities between the two statutes."); *Waag v. Thomas Pontiac, Buick, GMC, Inc.*, 930 F. Supp. 393, 406-08 (D. Minn. 1996) (holding supervisors cannot be held individually liable for sexual harassment under the MHRA).

**C.     Minnesota's whistleblower statute**

Minnesota's whistleblower statute prohibits an employer from taking adverse employment actions against an employee who "in good faith, reports a violation or suspected

violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932, subd. 1(a) (2004); *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 200 (Minn. 2000). When analyzing a claim under the whistleblower statute, a court uses the framework set forth in *McDonnell Douglas*. *Calvit v. Minneapolis Pub. Sch.*, 122 F.3d 1112, 1118 (8th Cir. 1997); *Graham v. Special Sch. Dist. No. 1*, 472 N.W.2d 114, 119 n.7 (Minn. 1991). "The employee has the burden to establish a prima facie case; the employer must present a legitimate reason for its action; and the factfinder must decide whether the employer's reasons are pretextual." *Calvit*, 122 F.3d at 1118. To establish a prima facie case, the employee must show: (1) he engaged in statutorily-protected conduct; (2) the employer took an adverse employment action; and (3) a causal connection between the two. *Id.*

Defendants first argue Brian Zogg and Deanne Zogg are entitled to summary judgment on Fjelsta's claim under the whistleblower statute because individuals cannot be held liable under the statute. An individual supervisor may not be held personally liable for retaliatory discharge under the Minnesota whistleblower statute. *Obst v. Microtron, Inc.*, 588 N.W.2d 550, 553-54 (Minn. Ct. App. 1999), *aff'd* 614 N.W.2d 196 (Minn. 2000). The Court therefore dismisses Fjelsta's whistleblower claim against Brian Zogg and Deanne Zogg.

Defendants next argue they are entitled to summary judgment on Fjelsta's whistleblower claim because Fjelsta cannot demonstrate a prima facie case. According to Defendants, Fjelsta did not engage in statutorily-protected conduct because she did not make, in good faith, a report of a violation or suspected violation of law. An employee makes a report under the whistleblower statute by either making or presenting an often official, formal, or regular account of the violation or suspected violation or relating or telling about the violation of suspected violation. *Gee v. Minn. State Colls. & Univs.*, 700 N.W.2d 548, 555 (Minn. Ct. App. 2005). The

parties do not dispute that Fjelsta reported a violation or suspected violation of law in her response to her six-month performance review. Again, in her response, Fjelsta asserted that Zogg Dermatology violated Minn. R. 6950.1060, subp. 2(A), by withdrawing fluids from a multi-dose vial with a sterile needle attached to a contaminated syringe.

In addition to the content of a report, a court must consider the employee's purpose in making the report to determine whether the employee made the report in good faith. *Obst*, 614 N.W.2d at 202. "The central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality. We look at the reporter's purpose at the time the reports were made, not after subsequent events have transpired." *Id.* (citation omitted). In this case, there is no evidence in the record to demonstrate that Fjelsta made the report for the purpose of exposing an illegality. Immediately after asserting that Zogg Dermatology violated Minn. R. 6950.1060, subp. 2(A), in her response to her six-month performance review, Fjelsta wrote: "I do believe that I am very knowledgeable when it comes to the many aspects of sterile procedures and that the improper use of [multi-dose vials] that occurs in this office needs to be rectified." Asked at her deposition what she wanted to happen as a result of writing the response, Fjelsta testified: "That they would accept their wrongdoing" and "work with [her]." Moreover, when Fjelsta made the report, Zogg Dermatology was well aware of how it used multi-dose vials. *See Obst*, 614 N.W.2d at 202-03 & n.5. In response to Fjelsta question's about the clinic's use of multi-dose vials, Deanne Zogg repeatedly assured Fjelsta that proper technique would prevent contamination. Fjelsta's stated purposes in making her report—to respond to her performance review and to promote a change in the clinic's standard procedure—reveal that she did not make the report for the purpose of exposing an illegality. Viewed in the light most favorable to Fjelsta, the record reveals that she did not make a good faith report within the

meaning of the whistleblower statute. *See id.*; *Rothmeier v. Inv. Advisers, Inc.*, 556 N.W.2d 590, 593 (Minn. Ct. App. 1996) (stating whether report is made in good faith is a question of fact). Consequently, she cannot establish her prima facie case. The Court therefore grants Defendants' motion for summary judgment as it relates to Fjelsta's claim under the whistleblower statute. *See Calvit*, 122 F.3d at 1118.

**D.     Battery**

Brian Zogg and Zogg Dermatology[4] argue that they are entitled to summary judgment on the battery claim because the Minnesota Workers' Compensation Act (WCA) bars it. "The workers' compensation system in Minnesota is based on a mutual renunciation of common law rights and defenses by employers and employees alike." Minn. Stat. §176.001 (2004). An employer "is liable to pay compensation in every case of personal injury or death of an employee arising out of and in the course of employment without regard to the question of negligence." *Id.* § 176.021. The employer's liability to pay compensation "is exclusive and in the place of any other liability." *Id.* § 176.031. The Act defines "personal injury" as "injury arising out of and in the course of employment." *Id.* § 176.011, subd. 16. A personal injury "does not include an injury caused by the act of a third person or fellow employee intended to injure the employee because of personal reasons, and not directed against the employee as an employee, or because of the employment." *Id.*; *see Foley v. Honeywell, Inc.*, 488 N.W.2d 268, 271 (Minn. 1992) (stating that an injury must arise out of the employment, must be in the course of employment, and must not come within the "assault exception" to be compensable under the WCA).

---

[4]     In her memorandum in opposition to Defendants' motion, Fjelsta asserts she also alleged a battery claim against Percs USA. Notwithstanding her assertion, she did not bring a battery claim against Percs USA, a fact previously noted by the magistrate judge in an Order dated July 12, 2005: "[N]either her original Complaint nor her proposed amended complaint allege battery against PERCS."

Fjelsta contends that the WCA does not apply to her because "she had been terminated" when Brian Zogg allegedly battered her. The record does not support her argument. In her August 11 e-mail to Brian Zogg and Deanne Zogg, Fjelsta wrote that she had assumed her employment was terminated after her removal from Zogg Dermatology. In addition, Deanne Zogg allegedly stated that Fjelsta was terminated at a meeting held after Fjelsta's removal from the clinic. Viewed in the light most favorable to Fjelsta, the record reveals that her employment was terminated at the earliest upon completion of her removal from Zogg Dermatology. *Cf. Krause v. Trs. of Hamline Univ. of Minn.*, 68 N.W.2d 124, 127 (Minn. 1955) (stating that, for purposes of liability under workers' compensation law, employer-employee relationship is not terminated unless complete control over employee is surrendered). Because Fjelsta was an employee at the time of the alleged assault, the Court turns to whether the WCA bars her battery claim.

The Court first considers whether the alleged battery arose out of and in the course of Fjelsta's employment. "The phrase 'arising out of' means that there must be some causal connection between the injury and the employment. This causal connection does not mean that the employment has to be the proximate cause of the injury." *Foley*, 488 N.W.2d at 271 (citations omitted). To occur in the course of employment, an injury must take place "within the time and space boundaries of employment." *Id.* at 272. As described in greater detail above, the alleged assault took place at Zogg Dermatology during one of Fjelsta's shifts. After reviewing Fjelsta's response to a performance review, Brian Zogg asked her to leave for the day. Fjelsta did not comply with his request, tensions escalated, and Brian Zogg allegedly pushed her out of the clinic. Viewed in the light most favorable to Fjelsta, the record reveals that the alleged

16

battery arose out of and in the course of her employment. *See McGowan v. Our Savior's Lutheran Church*, 527 N.W.2d 830, 834 (Minn. 1995). The Court turns to the assault exception.

> Cases involving the assault exception usually fall into one of three categories:
>
> (1) those that are noncompensable under the Act because the assailant was motivated by personal animosity toward his victim, arising from circumstances wholly unconnected with the employment; (2) those that are compensable under the Act because the provocation or motivation for the assault arises solely out of the activity of the victim as an employee; and (3) those that are compensable under the Act because they are neither directed against the victim as an employee nor for reasons personal to the employee.

*Id.* In this case, Fjelsta does not direct the Court to any evidence that Brian Zogg was motivated by personal animosity toward Fjelsta. The alleged battery was not wholly unconnected with Fjelsta's employment. Instead, it arose solely out of Fjelsta's activities as an employee. *See id.* Consequently, the assault exception does not apply and the WCA bars Fjelsta's battery claim. The Court therefore grants Defendants' motion for summary judgment as it relates to Fjelsta's battery claim.

**E.   Defamation**

"A statement is defamatory under Minnesota law if it is communicated to a third party, is false, and tends to harm the plaintiff's reputation in the community." *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 868 (8th Cir. 2005). "Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim." *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000); *see Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005) ("Minnesota law requires that a claim for defamation must be pled with a certain degree of specificity. At a minimum, the plaintiff must allege who made the allegedly libelous statements, to whom they were made, and where." (citation and quotations omitted)). Citing only paragraph 45 of Fjelsta's Complaint, Defendants assert Fjelsta failed to plead her defamation claim with sufficient specificity. Paragraph 45 states: "Since August 2003,

Defendants have caused to be published to third parties false and defamatory statements about Fjelsta, including, but not limited to, statements that Fjelsta had been terminated for endangering the safety of patients." Were Fjelsta's factual allegations in support of her defamation claim limited to paragraph 45, Defendants' argument might prevail. Fjelsta's allegations, however, are not so limited. In paragraph 19, Fjelsta alleges:

> Upon information and belief, after Brian Zogg removed Fjelsta, Deanne Zogg called a meeting of the Zogg Dermatology staff and informed them that Fjelsta was terminated for being a danger to patients. Upon information and belief, Deanne Zogg also told a Zogg patient that Fjelsta was terminated for endangering patients.

Because Defendants failed to explain how paragraph 19 is deficient, the Court rejects their assertion that Fjelsta failed to plead her defamation claim with sufficient specificity.

Defendants next argue that they are entitled to summary judgment on Fjelsta's defamation claim because there is no evidence in the record that they made defamatory statements. Fjelsta cites Stadheim's deposition testimony and an affidavit from Rhonda Christianson, the receptionist at Zogg Dermatology, to support the claim. As noted above, Stadheim testified at her deposition that Deanne Zogg held a meeting on August 11, 2003, immediately after Fjelsta's removal from Zogg Dermatology. At that meeting, according to Stadheim, Deanne Zogg said that Fjelsta was terminated. Stadheim did not testify that Deanne Zogg said Fjelsta was terminated for endangering patients. Stadheim's deposition testimony therefore does not support Fjelsta's defamation claim. As to Christianson, her affidavit states in relevant part:

> Deanne Zogg asked the staff to come into the office. I cannot remember what Deanne exactly said. I remember her saying something about Tanya not working here as long as she refused to do her job and something about endangering patients.

18

Christianson acknowledges that she does not recall Deanne Zogg's exact words. Christianson's vague recollection that Deanne Zogg said "something about endangering patients" is insufficient to support Fjelsta's defamation claim. *See Moreno*, 610 N.W.2d at 326 (requiring that "defamatory matter be set out verbatim"). Because there is no evidence in the record that Defendants made defamatory statements about Fjelsta, the Court grants their motion for summary judgment as it relates to her defamation claim.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion for Summary Judgment [Docket No. 11] is GRANTED.

2. This case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 28, 2006

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge